We're the next case United States v. Braga. Good morning, Your Honors. May it please the Court, my name is Brian Jacobs. I represent Appellant Richard Braga on appeal. I did not represent him below. Mr. Braga's conviction on count three of the indictment for federal programs bribery should be reversed because the evidence was completely insufficient to show any connection or any link or any exchange of a thing of value for an official act. And the remaining counts, counts two and four on which Mr. Braga was convicted, should be vacated and he should be retried because of the government's improper conduct in rebuttal that influenced the jury's decision on the key issue in the case, the credibility of the two cooperating witnesses. Turning first to the insufficiency of the evidence, the case never should have been charged as a bribery. This was a highly unusual case where the public official who was supposedly bribed actually testified as the government's cooperator but never says cleanly, I was bribed, I received something of value in exchange for an official act. And this may have said, he said things one way once and he said another thing another time. He did say something which would amount to bribery and would amount to bribery after the Silver case and everything else. And if the jury chose to believe that, why isn't that a standard thing of there is enough evidence, they didn't have to buy it, but they believed that side of the story that Mr. Procasa told. Your Honor, he certainly says things that provide some evidence of bribery and I think this Court has said there's always some evidence in a sufficiency challenge. But our position is that the evidence doesn't cross the threshold, it's not sufficient because the things Your Honor is referring to, and I agree there are certain statements in the record, none of them draw the connection between the official act and the thing of value. He says, for example, yes, one reason I committed fraud was I was getting these free car repairs. What about the evidence of the discussions about getting the free vehicle service for arranging the bills for the preventive maintenance services? Your Honor. Why doesn't that establish a connection? Your Honor, I don't believe Top Cape testifies at any point that I arranged the bills for preventative maintenance that wasn't done to be paid because I was getting... They were careful about it. I mean, there was discussion. I mean, maybe they weren't explicit, but certainly a jury could interpret the words to establish a connection. Your Honor, this was the government's cooperator. I want to talk specifically about what he actually says. What he says is one of my reasons for approving the invoices is I was getting free repairs. They weren't free. He was being billed. But that says nothing about what he... He was paying the bills. He was getting bills, but he never paid them, right? Correct, Your Honor. So that sounds like free work to me. Correct, Your Honor. But there was no agreement that that free work he started getting in 2009... No, Your Honor. ...whether those were done in exchange or not. Your Honor, it is, of course, up to the jury. But the work that was done here that Pop Cave did not pay for started in 2009. And it's many years later, in 2012, that Mr. Pop Cave agrees to begin committing fraud. There's simply not a connection between those two... But wasn't there at that very moment, wasn't there the undertaking by your client to forgive the $60,000 in racked-up debt? Your Honor, I'm glad you asked that. That's not what Pop Cave says. And the government points to an accounting entry, $47,000 that gets wiped off the books at that time. It's bizarre because they never actually asked Pop Cave about that forgiveness of debt. And when you look at the actual accounting entry... Because no one wipes out my $47,000 in debt. Your Honor, Pop Cave does not owe $47,000 at that time. He owes something like $27,000. There's an accounting entry in the exhibit on page 1,400 of the appendix, Your Honor, where there's a $47,000 entry and then a reversal where it's subtracted. It's an accounting error by the look of it on the... Someone let you run up a $27,000 bill or a $40,000 bill in this kind of a setting. It doesn't make any sense. This was happening for years, and it was happening with dozens of people based on the evidence in the trial record. And whatever the reasons are, it's not in exchange for committing fraud. And the idea that Mr. Brega would at some point in the future do something favorable, or that Mr. Pop Cave would do something favorable in the future thanks to this work that was being done, simply is the exact theory that Silver rejects. Silver says you need more, and I can quote the language, but you need more. The going forward transaction was not I will do something in the future to forgive a debt that was incurred in the past. The deal going forward was that work would be done on your client's cars and that of his family and friends without charge, and that in exchange your client would authorize payment for maintenance of school buses that was never done. Your Honor, that draws... Isn't that enough? I think you're drawing a connection that simply is not there in the record. Pop Cave's testimony doesn't draw that connection, and Pop Cave says why he was doing this fraud scheme. He was doing it because he needed slips showing he was getting the work done. I'd like to turn to the rebuttal issue. Why did he need slips? He needed slips saying he did the work so he could get paid. He could get paid out of a program that was sustained in part with federal money. He would have done it whether or not he was getting car repairs. He doesn't connect the reasons. He runs a garage and he doesn't charge anybody for his repair services? That's no way to run a railroad. That may be, Your Honor, but the record suggests and it says clearly that he does this with dozens of people and he's not good at collections, and I think that it doesn't connect that business. The jury is free to assume that he's not good at collections is a considerable understatement and maybe not true in light of all the other evidence that was given to the jury. I think that Popcave's testimony is not sufficient on its own to draw the connection that Your Honor is drawing and was not a sufficient basis for the jury to draw that inference. It's an inference. The juries can draw inferences. That's what they do. They can, but when the evidence is equally, could go one way or the other, it's not sufficient to convict. And the fact that the government relies on this $47,000 accounting entry where there's no testimony about it even and it's reverse engineering the evidence to make it look as though it's sufficient when it's not. Just on the rebuttal point briefly, Your Honors, this case all came down to Popcave's credibility, as we've been discussing. He was the key witness, and if I may, I reserve time for rebuttal, but if I can discuss this for just a moment. The prosecutor, the defense was that Popcave was not credible, and the prosecutor essentially told the jury that they didn't need to worry about Popcave having been strong-armed by the government to change his story, which he did after a year. Why wasn't this essentially an answer to the arguments that not you, because you weren't counsel below, but the counsel below made in an attack? So that it was one of those things where we have given more leeway. Now, you know, vouching is a very serious issue, but how much was there vouching? And in that context, was that sufficient to be really outrageous? Notice I'm not saying plain error, because I don't believe plain error applies here. I think it's a different standard, but it's a standard of outrageousness enough to be that. Yes, Your Honor. So defense counsel had a basis in the record for saying the witnesses were pressured. One of them, Lepore, actually said she was pressured by the government, and she didn't give in to the pressure. The government could have responded to that in myriad ways, including in ways the government's own brief suggests by pointing to the record and saying that the evidence doesn't support what defense counsel is saying or that the jurors observed the demeanor of the witnesses and could infer they weren't pressured. But that's not what the prosecutor here did. What the prosecutor did was say, essentially, we, the people at this table right here, those were the words, are career government employees who just seek justice. He said it twice. We seek justice, and we go where the case takes us. That crosses over a line. That is troubling. On the other hand, the prosecutors were poked, and the jury was told that they had awakened one fine day and decided to persecute and frame your client. So under our law, the prosecutor gets to bite back. How far is another question. But this is not just a matter where the prosecutor came out and said these things unprovoked. Your Honor, it is often the case that the defense argument is that the cooperators were not credible and changed their story at the government's pressure. In this case, it was particularly true because the cooperators, particularly Popcave, didn't incriminate my client for a year or more than a year. I understand why you might make that argument or the defense might make that argument, but isn't it also the case that if the defense makes that argument to a certain degree, that the prosecutors can say we're working for the Department of Justice, not the Department of Public Prosecutions? Your Honor, I think that there is a way that they can respond that is consistent with this court's precedent in a way that it's not. Exactly. And it may be that what they did went beyond what is most appropriate. But then the question is, in those circumstances, is the degree to which they went beyond reach that level of outrageousness which we have said is necessary for a reversal? And that's the question before us. You know, I think we all understand what that question is. And I think it did here because the jury deliberated longer than the trial itself. There was a split verdict with an acquittal on count five and a hung jury on count one. And it went to the central issue, Your Honor. I reserve the time for rebuttal. Thank you. We'll hear from the government. Judge Chin, Judge Jacobs, Judge Calabresi, may it please the Court. For years, Richard Braga committed a fraud on the Rockland-Boseys School District, which, to be clear, he admitted at the time of his sentencing. William Popcave, who was Rockland-Boseys' Director of Transportation, would send Braga lists of buses and their mileage, but not send the buses into Braga's facility to be inspected. Braga would doctor invoices and paperwork to make it look as if the buses had in fact been brought to his facility and serviced, even though he had not seen them. The paperwork did its job. Braga sent the invoices to Boseys. Popcave approved the invoices, and Braga was paid. What did Braga have to do for this? He served at Popcave's cars, Popcave's friends' cars, and Popcave's family's cars. Now, this was a document-intensive case. It wasn't a case simply dependent on the word of a cooperator, and I think that it helps just to walk you through a couple of documents so that way the Court can see this was kind of a no-brainer for the jury. I'll walk you through one example, because one of the things that the jury saw was that the same pattern repeated itself over and over with the fraud. If you look at page 41 of the supplemental appendix, you'll see a worksheet that was created on the Rockland-Boseys' parking lot on December 15th. I understand that. I'm a little troubled by your saying it's a no-brainer for the jury when you find this rather sophisticated jury not finding a conspiracy and hanging on something else and not finding obstruction of justice. I think it was a very interesting brainer for the jury. I'm not trying to demean the brains of the jury in any way, Your Honor, and I would point out that the document-intensive side of the case didn't reach the obstruction, where although there were text messages, that was also based in large part on the testimony of William Popkave. What I'm talking about is the fraud itself was absolutely clear from the documents, and the one thing that the jury got hung up on, and they did hang on count one, but if you look at the jury notes, what they were asking about was what has to be in Mr. Brego's mind in terms of agreeing to whether or not there's a mailing for whether or not he has engaged in a conspiracy to commit wire fraud. So it was a sophisticated jury, but it wasn't a question of whether the fraud was committed or whether the bribery was committed. There the jury found very quickly that the fraud was committed, that the bribes were committed, and that both the gratuities and theory of the bribery was committed there. That happened very quickly and early on. The deliberation was over the conspiracy count almost entirely. So if we go back to page 41, you see that this is an example of these worksheets that Popkave's men would create in the parking lot of Rockland BOCES, where they would go through all of the buses and chart these are the buses, here's how many miles are on the buses, and here's whether we put in, say, windshield wiper fluid. So for these purposes, if you look at 41, bus 43 on December 15, 2012, had 76,469 miles. If you look at page one of the supplemental appendix, that's a December 18 email from Popkave to Braga saying on December 15, 2012, bus 53 had 76,469 miles. If you look at page 116 of the supplemental appendix, that's an invoice from December 21, so six days after the bus was looked at by Popkave's people, purporting to inspect bus 53, giving it the exact same number of miles that Popkave had emailed. The following page is a backup worksheet purportedly by the mechanic. Now, this can't be. Among other things, even if that bus hadn't been used between December 15 and when it shows up at Braga's lot, it has to get driven to Braga's lot, which the testimony was was about nine miles away. This shows that this bus isn't actually coming in. He's simply taking what Popkave says. Now, it would be possible that one time he was lazy and just wrote down the wrong number, although it doesn't explain how his mechanic writes down the wrong number since the mechanic is actually inspecting the bus. But you see this over and over, so let's look at bus 93. 43 of the appendix shows that on November 17, 2012, it had 155,000 miles. Well, all of these things go to there being a fraud, but in order for it to be a bribery, you have to show that this was done in exchange for something, and so far your documents don't go to that. That's right. Well, there are documents that do go to that, and I will point out that on the mail fraud, the jury found a property and money fraud as well as honest services fraud. So even if there were an issue, and we contend there's not, but even if there were an issue with honest services fraud, the count would still stand because there's no question and nobody has targeted the money and property fraud that was also found for count two. As for the bribery, as you pointed out, Judge Calabresi, there was, in fact, discussion between Brega and PopCave linking these two, but there was also documentary evidence in the form of the account worksheet. There was also documentary. What was the conversation? The conversation was that early on, PopCave was told, and this was not a conversation with Brega. I don't want to make it into something it wasn't, but rather to set the background for what happens later. PopCave is told by another local official, you know, Brega will take care of you. You take care of him. Just send your own vehicles to him. And what he found is that what he was promised actually happened. Now, it's not a claim that Brega said that. We are not saying that by any means. If that's all there was and it ended there, there wouldn't be enough. But what happens is in 2012, Brega comes in and confirms that this is, in fact, the deal. How does he do that? He proposes the fraud to PopCave, and when he does, he keeps on reminding, and PopCave says it happened whenever Brega talked to him about the fraud, reminded him what his bill was up to at that point. His personal bill. Pardon? His personal bill, which by 2017, I'm sorry, the end of 2012, was up around $45,000, another $2,000 or so was added in the next month. You say that while they are talking about the fraud, he says, and by the way, your bill is this. That's right. And the jury should be allowed to say that that is a quid pro quo. That's right. They should be allowed to say that's a quid pro quo, and Brega himself has linked the two by doing that and doing it every time. And then he confirms that there's no misunderstanding when he cancels out the bill. And to be clear, there was, in fact, testimony about the accounting statement. If you look at the transcript starting at page 540 and going on for about, I think it was about 15 pages or so, Valerie Kafka, who was Brega's own bookkeeper, testified at length about the accounting statement and what it meant. First of all, she said there was $47,000 of debt. It only showed about $27,000 because the accounting statement only went back to 2011, and she said they had a system before that that wasn't reflected on the counting statement. And as your honors may recall, Popkay started bringing his cars to Brega in 2009. That explains the delta there. And then also, if you see, there wasn't simply a reversal and double reversal, as has been said here, that this was just an accounting trick. Rather, on January 31st, there's a single cancellation in whole of $47,000 of debt. A month later, slightly over a month later, on March 7th, that transaction is reversed, and at the same moment, and if you could look at pages 1400 through 1401 of the appendix, you'll see this, that same $47,000 is subtracted out again, except this time it's on an invoice-by-invoice basis. And again, Valerie Kafka testified about this. The whole point was you can't simply do a $47,000 correction. She said she had nothing to do with this. She said, I wouldn't have done it because Popkay wasn't paying any bills. We didn't get any checks. I saw this on the accounting system. I said, this is crazy. This should not be. I went to Brega, and all Brega did was he said, I know nothing about that, and he smirked at me. And I got mad, and I yelled at him, and I slammed the door. And the inference that the jury can take is that the opposing counsel suggested that Popkay had any number of other bills of the order of this because he was slow in billing, and that the fact of all these others suggests that he just did that, and that there was no quid pro quo. Is that in the record? No, that's not in the record, and in fact, Valerie Kafka said that this was a unique situation, and she was the bookkeeper for Brega. So that's not in the record. That is something that is simply taken from thin air right here. But what justifies telling the jury that, you know, we're so busy prosecuting crimes, and why would we prosecute innocent people? That isn't exactly what was said, and I think it's worth looking at exactly what was said. And by the way, I will say this was not an ideal statement. You don't think the government is busy enough prosecuting crimes that it has the time to be prosecuting innocent people? That's not what the government said. That was what the government said in Freedman. That is not what the government said here. Here, I admit, in Freedman, that was troubling. Yes, yes, yes, you're quite right. Here, and I think it's worth quoting and more importantly putting in context, and by the way, I will say this was not a perfect statement in the rebuttal. I'm not claiming otherwise. The question is whether it was improper, and if so, so improper, that it amounted to flagrant abuse and fundamentally undermined the confidence of this court and the public in the verdict, a verdict that, again, Mr. Brega confirmed when he confessed after the trial. What he said was there's a suggestion that somehow Popcave got to that place where he pleaded guilty himself. What page are you looking at? Oh, I'm sorry. This is on pages 1011 through 1013 of the transcript, to that place where he pleaded guilty himself for his conduct of five felonies because he was strong-armed by the government to get there because the government wants to get the defendant, Richard Brega, and to that I would say to the defense, please do not flatter yourself. Don't flatter yourself. We're not that interested. This is career government folks looking for justice. You go where the case takes you. You look for justice, and then the next line puts it in context. Admittedly, on its own, not the finest statement. I made an unfair imputation, but what you read is not exactly creditable either. It's not perfect, but the next line helps to explain what was being said there. The context matters. This is not about strong-arming people into getting anybody, any particular person. There's no evidence that anybody here knows Richard Brega, cares about Richard Brega, has a personal stake in this case, and this matters. Mr. Lawrence was calling out the prosecutors by name during his closing. He repeated over and over, you should be angry at the government. The government has strong-armed these people. These people came in, and they understood that the prosecutors wanted them to name Mr. Brega, and they ended up doing it. Your adversary says that the witnesses conceded that they had been subject to government pressure. One witness said that she had felt pressured when she met with the government. The cooperating witness and the non-prosecution witness did not say that at all. That was Bobbi-Ann Lepore, who started out her cross-examination by saying, I've known Richard Brega since we were kids. He's always taken care of me. This was his good friend, and she said, I did feel pressured, but I didn't change my testimony as a result. There was no testimony from the other witnesses that they were pressured, and, in fact, an FBI agent, Catherine McPadden, was put on the stand solely to put in charts on direct, and on cross it turned into an attempt to get her to effectively confess to pressuring the witnesses, and she did not do so either. Nonetheless, defense counsel during it says, well, ladies and gentlemen, guess who decides whether he's telling the truth or not? It's not you. It's these two guys, Mr. Ali and Mr. Maimon, who decide that, and that's on page 955 of the transcript. He says of Popcave, he's a sick man who was strong-armed and pressured into pointing the finger at Mr. Brega, and that's at page 956 of the transcript. He says at page 950 that the government strong-armed witnesses into falsely accusing Richard Brega of illegal acts, and that this is a carefully engineered case that should leave you angry at the government. He said that Mr. Sweeting's testimony was, quote, a result of coercion by the government. He said, and this is at page 965, there is not a shred of doubt you can have that Mr. Sweeting knew what the government wanted him to say in connection with his testimony against Mr. Sweeting. I think he meant Mr. Brega. They wanted him to say that Mr. Brega is guilty and that he participated in improper acts, and in fact, when he was finishing his rebuttal, he said, in fact, 10 years as a prosecutor in the same office as Mr. Maimon and Mr. Ali, this is vouching for his own credentials, where he says, I worked with these guys. And then he says, but you don't want to convict him and then wake up one day and say, I shouldn't have relied on what I heard from the government or the government's conduct in squeezing witnesses to testify against Mr. Brega. And if there are no other questions, we rest on our papers. Roboto? Your Honor, I think the confusion with Friedman is not surprising because the statement was highly similar to the statement that this court I have the two statements side by side. And surely the question is the extent of the propagation by the government, which is entitled to defend itself. Your Honor. And individual prosecutors, they should lose their temper, but it doesn't look like they've lost their temper. It looks like they hit back hard on exactly the grounds of attack. Your Honor, I think there's still an obligation to point the jury at the record, refer to what's in the record. The prosecutors under no circumstances, no matter how hard they're poked under no circumstances, can they give what is effectively unsworn testimony that all they do is seek justice and follow the evidence that that is not permissible in any context. And there's no case the government site that is authorized that kind of statement. It's a statement from the government saying, I, the prosecutor, or in this case, he says, we, the people at the tables right here. All we do is judge charge the jury that what the council may say is not evidence. No, Your Honor, but I don't think that's the test. The test is whether this crossed the line that this court has drawn between what's permissible and impermissible. And there's no authority that we're aware of that says that when they're poked hard enough, they can say whatever they like or essentially vouch for themselves and their witnesses. So the poking here was hard. I agree, Your Honor. But defense counsel argues that they are strong arming people. Can the government not respond that we are not the government that you could? You heard no testimony from any of the three witnesses that they were strong armed. You heard one isolated piece of testimony from the poor and the fact that the others took a year to change. There's no doubt that the government could have done it right and didn't. The question is whether what they did do, which was not the right way of doing it, is sufficiently outrageous to say that this verdict cannot stand. That's a question before us, and I think we're going to have to think about it. Thank you, Your Honor. Thank you. We'll reserve decision.